FIRST AMERICAN NATIONAL BANK *v.* CHRISTIAN FOUNDATION LIFE INSURANCE COMPANY ET AL

5-4168                    408 S. W. 2d 912

Opinion delivered May 29, 1967

[Petition for rehearing withdrawn December 4, 1967.]

*Spitzberg, Bonner, Mitchell. & Hays,* for appellant.

*Shaw & Shaw* and *Wright, Lindsey & Jennings;* By: *George E. Lusk Jr.,* and *Pope, Pratt, Shamburger, Buffalo & Ross,* for appellees.

GEORGE ROSE SMITH, Justice. This is a suit brought by one of the appellees, Christian Foundation Life Insurance Company, for a declaratory judgment with respect to the validity of certain duplicate bearer bonds ostensibly issued by the First Methodist Church of Mena. That duplicate bonds were outstanding was due to the fraud of the late Lawrence Hayes, former president of Institutional Finance Company, which handled the bond issue as fiscal agent for the church. Parties to the suit include the rival owners of the duplicate bonds, the church and its trustees, the Union Bank of Mena, which acted as paying agent for the bonds, the estate of Hayes,

the receiver for Institutional Finance, and the corporate surety upon Institutional Finance's qualifying bond as a securities dealer.

The chancellor apparently viewed the case as being primarily a contest between the appellant, First American National Bank of North Little Rock, which holds $28,800 of the bonds, and Christian Foundation Life and Charles R. Richards, who purchased respectively $20,000 and $5,000 of bonds that are duplicates of some of those held by First American. The chancellor, without stating a reason for his decision, found that First American's bonds are void and that the duplicates held by Christian Foundation Life and Richards are valid.

We need state the facts only in broad outline. On January 19, 1964, the church adopted a resolution authorizing a $90,000 bond issue for the construction of a new church and employing Institutional Finance as its fiscal agent to market the bonds. On the same day the church treasurer, Bettie Jean Montgomery, in the presence of the pastor and a trustee of the church, affixed her signature to a blank sheet of paper and delivered it to Joe B. Springfield, executive vice-president of Institutional Finance, for use as a facsimile signature upon the bonds.

Two days later Springfield requested a printing company to print the bonds, which were numbered from 1 to 188 and totaled $94,000. (The record does not explain why an extra $4,000 of bonds was printed.) On January 30 the printer delivered the bonds to Springfield. They bore the facsimile signatures of Springfield and Mrs. Montgomery, with no provision for an authenticating manual signature.

Institutional Finance sold $45,000 of the bonds to members of the church but had trouble in finding buyers for all the rest of the issue. On July 3, 1964, Hayes personally borrowed $25,000 from First American National Bank and pledged as collateral, along with other

securities, $27,000 (later increased to $28,800) of the Mena church bonds. There is no sound basis for questioning the bank's standing as a good faith purchaser for value, as those terms are defined in the Uniform Commercial Code. Ark. Stat. Ann. § 85-1-201 (Add. 1961). Hayes had borrowed money from the bank on a number of occasions. The bank's president, who handled this loan, understood Hayes to be an employee of a Texas dealer in church bonds and was unaware of his connection with Institutional Finance. Nothing in the transaction warned the bank that Hayes did not own the bonds.

On February 1, 1965, Hayes fraudulently ordered the printer to print $25,000 of numbered bonds that included duplicates of some of those pledged to the bank. Later in the month Hayes, in order to complete a sale to Christian Foundation Life, had printed additional bonds in certain larger denominations requested by that insurance company. The duplicate bonds now held by Richards and Christian Foundation Life are among those obtained by Hayes in the two supplemental printings.

We find no merit in the appellant's insistence that its adversaries were not purchasers in good faith because they bought the bonds at discounts of 10 and 15 per cent. We have held that the price paid for a negotiable instrument may be so grossly inadequate as to support a finding of bad faith, *Hogg* v. *Thurman*, 90 Ark. 93, 117 S. W. 1070, 17 Ann. Cas. 383 (1909), but there is no proof in this record to indicate that the discounts offered to the appellees were so great as to arouse suspicion. Nor is there evidence to sustain the appellant's argument that the purchasers of the duplicates should have been put upon inquiry by the church's apparent inability to market the entire bond issue within a period of about a year.

Hayes's dishonesty finally became known when duplicate interest coupons were presented to the Mena

bank for payment. The paying agent refused to honor the coupons until their validity had been established. Hence this suit.

We think the chancellor should have found all bonds held by bona fide purchasers to be binding obligations of the church. It is plain enough that the church was careless in entrusting its treasurer's facsimile signature to Institutional Finance and in failing to take the precaution of requiring authentication of the bonds by a manual signature. By contrast, the holders of the bonds acquired them in the ordinary course of business and in circumstances entitling them to the protection afforded to bona fide purchasers.

The case is controlled by the pertinent provisions of the Uniform Commercial Code. Before the adoption of the Code the church might have been held liable by contract to one purchaser and in damages to the other, but the draftsmen of the Code point out in their Comment to our § 85-8-202 that the Code simply validates most defective securities in the hands of innocent purchasers, refusing to prefer one such purchaser over another.

Specifically, this controversy falls within § 85-8-205, which provides that an unauthorized signature is effective in favor of an innocent purchaser when the signing is done either by a person entrusted by the issuer with the signing of the security or by an employee of such person or of the issuer itself. By resolution the church employed Institutional Finance as its fiscal agent to handle the sale of the bonds. The first line of the printed prospectus for the bond issue identified that concern as the issuer's fiscal agent. There can hardly be any serious contention that Hayes's wrongful use of the treasurer's facsimile signature did not fall within the purview of the Code.

We are not impressed by the appellees' argument that the appellant's acquisition of its bonds was in violation of our constitutional declaration that ''No private

corporation shall issue stocks or bonds, except for money or property actually received or labor done.'' Ark. Const., Art. 12, § 8. Even if the church is to be considered a private corporation, which we need not decide, it is confronted by the fact that its agent actually received money for the bonds. That the money did not reach the church treasury was not the purchasers' fault.

It is too early at this stage of the litigation to reach a final conclusion about the exact remedies of the bond-holders. The church's refusal to pay interest was not absolute, being conditioned upon its uncertainty about the validity of the outstanding bonds. Under the Code it is liable to all bondholders who bought in good faith. It does not follow, however, that all bondholders stand in parity if it becomes necessary for them to foreclose the lien against the church property. First American's priority in time entitles it, as against the holders of duplicate bonds, to priority of lien, under the equitable maxim that as between equal equities the first in time must prevail. *Miller* v. *Mattison,* 105 Ark. 201, 150 S. W. 710 (1912). If the law were otherwise the security interest held by bona fide purchasers of a bond issue could be diluted by the later wrongful sale of duplicate bonds. The cause must also be remanded for the development of the bondholders' remedy against Institutional Finance and its surety.

Reversed and remanded.

JONES, J., dissents.

J. FRED JONES, Justice, dissenting. I do not agree with the conclusion reached by the majority in this case, nor do I agree with the decision of the chancellor.

Our Uniform Commercial Code, Ark. Stat. Ann. § 85-8-202 (3) (Addn. 1961), is as follows:

''Except as otherwise provided in the case of certain unauthorized signatures on issue (section 8-205 [§

85-8-205]), lack of genuineness of a security is a complete defense even against a purchaser for value and without notice.''

Just what constitutes the genuineness of a security is not set out in chapter 8 of the Code on investment securities, but § 85-1-201 contains forty-six numbered general definitions, one of which is as follows:

''(18) 'Genuine' means free of forgery or counterfeiting.''

The First Methodist Church of Mena authorized the Institutional Finance Company to print and sell $90,-000.00 worth of bonds. Under this authorization Springfield, who was executive vice-president of Institutional Finance, and who held title to church property in trust to secure the payment of the bonds, fully carried out, and in fact exceeded by $4,000.00, the authority given him by the church. He had bonds printed with consecutive numbers from 1 through 188 in the total amount of $94,000.00. Some of these identical bonds came into the hands of the appellant, First American National Bank, as a bona fide purchaser for value under the Code.

After the entire issue authorized by the church had been printed by Springfield, Mr. Hayes, the president of Institutional Finance, had printed unauthorized duplicates of the bonds authorized by the church and printed by Springfield, and without the knowledge of, or authority from, First Methodist, sold these duplicate bonds to Christian Foundation Life Insurance Company and to C. R. Richards, who were also bona fide purchasers for value under the Code.

It is my view that the duplicate bonds printed without authority and certainly with the apparent intent to defraud, were forged counterfeits of the original bonds and lacked the genuineness of the original authorized bonds, and that their lack of genuineness was a complete defense even against Christian Foundation and Reverend C. R. Richards.

The Commercial Code contains numerous definitions and comments of intention for its use and operation but, it contains no definition of "forgery" or "counterfeit" as would affect the genuineness of bonds. Black's Law Dictionary defines "forge" as follows:

> "To fabricate, construct, or prepare one thing in imitation of another thing, with the intention of substituting the false for the genuine, or otherwise deceiving and defrauding by the use of the spurious article. To counterfeit or make falsely. Especially, to make a spurious written instrument with the intention of fraudulently substituting it for another, or of passing it off as genuine; or to fraudulently alter a genuine instrument to another's prejudice."

"Forgery" is defined as:

> "The falsely making or materially altering with intent to defraud, any writing which, if genuine, might apparently be of legal efficacy or the foundation of a legal liability."

"Counterfeit" is defined in Black's as:

> "To forge; to copy or imitate, without authority or right, and with a view to deceive or defraud, by passing the copy or thing forged for that which is original or genuine."

Over one hundred years ago this court defined forgery as having a fixed legal meaning, "It is the fraudulent making or alteration of any writing to the prejudice of another man's rights, or a false making, *malo animo,* of any written instrument, for the purpose of fraud or deceit * * * to forge or counterfeit the instrument is to create or make it." *Van Horne* v. *The State,* 5 Ark. 249.

Under the majority holding in this case, once authority is given to an unscrupulous agent to print and sell a limited number of bonds over a facsimile signature, the

principal or issuer has no further protection from being bound by such individual. A revocation of authority, or even confinement in the penitentiary, would offer no protection. Such agent or ex-agent, would be able to bind his former principal, or the issuer of bonds, for as long as such agent could find innocent purchasers and access to a printing press.

I would reverse the chancellor in this case and hold that the original bonds held by First American are genuine and legal bonds, but that the duplicates sold to Christian Foundation and Reverend Richardson are forged counterfeits of the originals and are not genuine but are void as binding obligations of First Methodist.